Slip Op. 13- 158

UNITED STATES COURT OF INTERNATIONAL TRADE

APEX EXPORTS and FALCON
MARINE EXPORTS LIMITED,

                              Plaintiffs,

v.

UNITED STATES,

                              Defendant,

 and

AD HOC SHRIMP TRADE ACTION
COMMITTEE and AMERICAN SHRIMP
PROCESSORS ASSOCIATION,

                    Defendant-Intervenors.

Before: Richard W. Goldberg, Senior Judge
Consol. Court No. 11-00291

**PUBLIC VERSION**

## <u>OPINION</u>

[Plaintiffs' Motion for Judgment on the Agency Record under USCIT Rule 56.2 is denied.
Defendant-Intervenors' Motion for Judgment on the Agency Record under USCIT Rule 56.2 is
denied.]

Dated:  December 31, 2013

   *Lizbeth R. Levinson*, Kutak Rock LLP, of Washington, DC, argued for plaintiffs.  With
her on the brief was *Ronald M. Wisla*.

   *Joshua E. Kurland*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S.
Department of Justice, of Washington, DC, argued for defendant.  With him on the brief were
*Stuart F. Delery*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Patricia
M. McCarthy*, Assistant Director.  Of counsel on the brief was *Scott D. McBride*, Senior
Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of
Commerce, of Washington, DC.

   *David A. Yocis*, Picard Kentz & Rowe LLP, of Washington DC, argued for defendant-
intervenor Ad Hoc Shrimp Trade Action Committee.  With him on the brief were *Andrew W.
Kentz*, *Nathaniel Maandig Rickard*, and *Jordan C. Kahn*.

*Geert M. De Prest*, Stewart and Stewart, of Washington, DC, argued for defendant-intervenor American Shrimp Processors Association.  On the brief were *Edward T. Hayes*, Leake & Andersson, LLP, of New Orleans, LA, and *Terence P. Stewart*, *Elizabeth J. Drake*, and *Stephanie R. Manaker*, Stewart and Stewart, of Washington, DC.

Goldberg, Senior Judge:  This consolidated action challenges three determinations made by the U.S. Department of Commerce ("Commerce" or the "agency") in the final results of an administrative review of an antidumping duty order on frozen warmwater shrimp from India. *Certain Frozen Warmwater Shrimp from India*, 76 Fed. Reg. 41,203 (Dep't Commerce July 13, 2011) ("*Final Results*").

Plaintiffs Apex Exports and Falcon Marine Exports Limited (collectively, "Apex" or "Plaintiffs") challenge the dumping margin Commerce assigned them during the review. Specifically, Plaintiffs allege Commerce inflated the normal value of their exports.  Commerce did so by refusing (wrongly, in Plaintiffs' view) to subtract from Plaintiffs' costs of production the interest Plaintiffs earned on certain antidumping duty refunds.  Defendant-Intervenors Ad Hoc Shrimp Trade Action Committee and American Shrimp Processors Association (collectively, "Ad Hoc" or "Defendant-Intervenors") also challenge the dumping margin.  They argue Commerce underestimated the margin by refusing to deduct antidumping duties from Plaintiffs' export prices.  Finally, Plaintiffs allege Commerce wrongfully applied zeroing to calculate their margins.

The court finds that each of these contested decisions was grounded in substantial evidence and in accordance with law.  Consequently, both Plaintiffs' and Defendant-Intervenors' motions are denied.  The court sustains Commerce's decisions with respect to all issues.

## BACKGROUND

In February 2005, Commerce published an antidumping duty order on certain frozen warmwater shrimp from India. *See Certain Frozen Warmwater Shrimp from India*, 70 Fed. Reg. 5147 (Dep't Commerce Feb. 1, 2005) (final determination and antidumping duty order). Commerce initiated the order's fifth administrative review on April 7, 2010. *See Certain Frozen Warmwater Shrimp from Brazil, India, and Thailand*, 75 Fed. Reg. 17,693 (Dep't Commerce Apr. 7, 2010) (initiation of admin. reviews). Plaintiffs, both exporters of the subject merchandise, were selected as respondents. On March 4, 2011, Commerce published the preliminary results of the review. *See Certain Frozen Warmwater Shrimp from India*, 76 Fed. Reg. 12,025 (Dep't Commerce Mar. 4, 2011) ("*Preliminary Results*").

Plaintiffs then filed a case brief challenging two of Commerce's determinations in the Preliminary Results: the agency's refusal to grant an interest offset against Plaintiffs' financial expenses and its use of zeroing during the review. *See* Apex 56.2 Mot. for J. on Agency R. 4−5, ECF No. 36 ("Apex Br."). Some factual explanation is needed to frame Plaintiffs' first claim. During the second administrative review of the antidumping duty order now at issue, Plaintiffs were charged estimated antidumping duties of 10.17%. *See id.* at 3−4. Plaintiffs deposited these estimated duties with U.S. Customs and Border Protection ("Customs") during the period from February 2006 to January 2007. *See* Issues & Decisions Mem. at cmt. 4, PD 184 (July 5, 2011), ECF No. 49 (Apr. 26, 2012) ("*I&D Mem.*"). Later, when the second review's final results were issued, the final dumping rate was lower than the 10.17% deposit rate. *See Certain Frozen Warmwater Shrimp from India*, 73 Fed. Reg. 40,492, 40,495 (Dep't Commerce July 15, 2008) (final admin. review) (assigning both Plaintiffs a 1.69% rate). Customs refunded the difference

between the deposit rate and the final rate, plus interest, during the review period for the fifth administrative review.  Apex Br. 3−4.

When reporting their financial expenses for the fifth administrative review, Plaintiffs asked Commerce to use interest earned on the refunds to offset certain cost-of-production calculations relevant to Plaintiffs' normal value.  Commerce barred the offset, however, reasoning that Plaintiffs' interest income was not attributable to short-term investments.  *See Preliminary Results*, 76 Fed. Reg. at 12,030.  Plaintiffs challenged this decision, arguing (1) the interest earned on refunds was short-term in nature because it was received less than one year after Commerce ordered the liquidation of the entries, and (2) the refunds were related to Plaintiffs' current operations and were thus not an "investment."  *See* Apex Br. 4−5.

Defendant-Intervenors also contested Commerce's dumping margin in their case brief, but to the opposite effect.  Ad Hoc 56.2 Mot. for J. on Agency R. 5, ECF No. 35 ("Ad Hoc Br.").  Although the law permits Commerce to deduct from the export price any "costs, charges, . . . expenses, and United States import duties" associated with importing foreign merchandise, Tariff Act of 1930 § 772, *as amended*, 19 U.S.C. § 1677a(c)(2)(A) (2006),[1] Commerce refused to deduct antidumping duties from Plaintiffs' export price, *I&D Mem.* at cmt. 3.  Ad Hoc said Commerce erred by declining to deduct these duties and underestimated Plaintiffs' true dumping margin.

Commerce rejected all of these arguments and issued the Final Results on July 13, 2011.  *See Final Results*, 76 Fed. Reg. at 41,203; *I&D Mem.* at cmts. 1, 3−4.  Shortly thereafter, Apex

---

[1] Further citations to the Tariff Act of 1930 are to the relevant portions of Title 19 of the U.S. Code, 2006 edition.

lodged a complaint to challenge Commerce's determinations regarding the interest offsets and

zeroing. *See* Compl., Consol. Court No. 11-00291, ECF No. 8. Ad Hoc also filed a complaint to

challenge Commerce's refusal to deduct antidumping duties from Apex's export price. *See*

Compl., Court No. 11-00286, ECF No. 2. Apex's and Ad Hoc's cases were consolidated into the

present action in October 2011. Order, Consol. Court No. 11-00291, ECF No. 29.

## JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction over the parties' claims pursuant to section 201 of the

Customs Court Act of 1980, *as amended*, 28 U.S.C. § 1581(c) (2006).[2] The Court must "uphold

Commerce's determination unless it is 'unsupported by substantial evidence on the record, or

otherwise not in accordance with law.'" *Micron Tech., Inc. v. United States*, 117 F.3d 1386,

1393 (Fed. Cir. 1997) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i) (1994)). Substantial evidence is

"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *accord Matsushita Elec. Indus. Co. v.*

*United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). When reviewing agency determinations,

findings, or conclusions for substantial evidence, the Court determines whether the agency action

is reasonable in light of the entire record. *See Nippon Steel Corp. v. United States*, 458 F.3d

1345, 1350–51 (Fed. Cir. 2006).

Furthermore, when deciding whether an agency determination is in accordance with law,

the Court deploys the two-step framework announced in *Chevron, U.S.A., Inc. v. Natural*

*Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Under *Chevron*, the Court first assesses

---

[2] Further citations to the Customs Courts Act of 1980 are to the relevant portions of Title 28 of the U.S.
Code, 2006 edition.

whether the statute expresses Congress's unambiguous intent on a given issue.  *Id.* at 842−43.  If

the statute is ambiguous, the Court next decides "whether the agency's [interpretation of the

statute] is based on a permissible construction of [that] statute."  *Id.* at 843.  The Court must

uphold the agency's reasonable reading of the statute, even if the Court would not have adopted

that reading on its own.  *Id.* at 843 n.11.

## DISCUSSION

Plaintiffs raise the same two issues on appeal as were raised in their case brief:  (1)

whether Commerce unlawfully refused to deduct interest earned on antidumping duty refunds

from Plaintiffs' financial expenses, and (2) whether Commerce unlawfully deployed its

"zeroing" methodology in the review.  Defendant-Intervenors raise one issue on appeal, namely,

whether Commerce unlawfully refused to deduct antidumping duties from Plaintiffs' export

price.  The court first addresses Plaintiffs' argument regarding interest deductions from financial

expenses, then turns to Defendant-Intervenors' argument regarding antidumping duty deductions

from Plaintiffs' export price.  Plaintiffs' zeroing argument is analyzed last.

The court concludes that each of the decisions contested in this case was supported in

substantial evidence and in accordance with law.

### I.    Commerce's Refusal to Offset Interest Earned on Antidumping Duty Refunds Is Supported by Substantial Evidence and in Accordance with Law

Plaintiffs' first claim arises from Commerce's calculation of the normal value of

Plaintiffs' goods.  In general, a good's normal value equals the good's sale price in the exporter's

home country or another foreign country.  *See* 19 U.S.C. § 1677b(a)(1)(B).[3]  Commerce may

---

[3] In this case, Commerce generated export prices for Plaintiffs' products using sales data not from India, but from Japan and the United Kingdom.  *Preliminary Results*, 76 Fed. Reg. at 12,026.

find, however, that the exporter sold its goods at less-than-cost in those foreign markets.  If the sales were substantial, not at prices sufficient to recover costs in a reasonable time, and made over an extended period, Commerce may disregard them in calculating normal value.  *Id.* § 1677b(b)(1).

To pinpoint below-cost sales, Commerce first calculates the exporter's costs of production, which include costs of materials, container costs, and administrative and financial expenses.  *See id.* § 1677b(b)(3).  Commerce subtracts from the exporter's financial expenses any interest the exporter earned on short-term investments associated with the export.  *Pakfood Pub. Co. v. United States*, 34 CIT __, __, 724 F. Supp. 2d 1327, 1354 n.50 (2010).  Commerce allows this offset in recognition of producers' need to maintain working capital reserves for daily cash requirements.  *Id.* at __, 724 F. Supp. 2d at 1356−57 n.54.  Commerce does not, by contrast, allow offsets for income from long-term investments.  *See, e.g.*, *Dynamic Random Access Memory Semiconductors of One Megabit or Above from the Republic of Korea*, 65 Fed. Reg. 68,976 (Dep't Commerce Nov. 15, 2000) (final admin. review) and accompanying Issues & Decisions Mem. at cmt. 7, A-580-812 (Nov. 15, 2000).  If the exporter's costs of production exceed sales prices in the foreign market, then Commerce deems those sales below-cost and excludes them from normal value.  *See* 19 U.S.C. § 1677b(b)(1).

Here, when computing the normal value of Plaintiffs' exports, Commerce investigated whether Plaintiffs had made below-cost sales in foreign markets.  When adding up Plaintiffs' costs of production, Commerce refused to grant an offset for interest Plaintiffs earned on antidumping duties refunded during the fifth administrative review.  Commerce subsequently

found that both Plaintiffs made below-cost sales and declined to include these sales in its calculations of Plaintiffs' normal value. *Preliminary Results*, 76 Fed. Reg. at 12,030.

On appeal, Plaintiffs claim Commerce should have furnished an offset for their interest income. Plaintiffs argue the interest was short-term in nature, and even if not, that the interest was related to their current operations. *See Hyundai Elecs. Indus. Co. v. United States*, 28 CIT 517, 539, 342 F. Supp. 2d 1141, 1161 (2004) (permitting interest offset for long-term interest relating to current operations). Neither of these arguments shows, however, that Commerce should have deducted interest earned on antidumping duty refunds from Plaintiffs' financial expenses. *See Pakfood*, 34 CIT at __, 724 F. Supp. 2d at 1357 (holding party requesting the offset bears burden to show the offset is warranted).

    1.  <u>The Interest Plaintiffs Earned on the Refunds Was Not Short-Term in Nature</u>

As mentioned above, Commerce may deny interest offsets if the respondent making the claim "cannot demonstrate that the interest income . . . is short-term in nature." *Pakfood*, 34 CIT at __, 724 F. Supp. 2d at 1357. Accordingly, Plaintiffs argue that the interest they earned on antidumping duty refunds was short-term in nature. They claim they did not know, in the period immediately following the second review's preliminary results, that they would receive a refund at all. Only upon liquidation does the importer learn whether it will receive a refund and associated interest. Thus Plaintiffs argue the date of deposit should be irrelevant to determining whether interest earned on those deposits is long- or short-term. Apex Br. 11. Furthermore, Plaintiffs allege that because any refunds must occur within six months of the liquidation date, *see* 19 U.S.C. § 1504(d), "any interest that flows from the deposits [was] short-term in nature." Apex Br. 11.

The court disagrees with this logic.  The hallmark of a short-term deposit is whether it constitutes "liquid working capital reserves which would be readily available for the companies to meet their daily cash requirements."  Def.'s Mem. in Opp'n to Pls.' 56.2 Mots. For J. on Agency R. 14, ECF No. 44 ("Gov't Br.") (quoting *Certain Frozen Warmwater Shrimp from Thailand*, 74 Fed. Reg. 47,551 (Dep't Commerce Sept. 16, 2009) (final admin. review) and accompanying Issues & Decisions Mem. at cmt. 7, A-549-822 (Sept. 16, 2009) ("*Thailand Shrimp Mem.*")).  Antidumping duty payments to Customs do not satisfy this criterion.  Duty payments are in fact compelled and in no way act as "reserves."  Furthermore, even upon liquidation—when refund payments to the importer are assured—antidumping duty refunds may not be "readily available" for daily cash requirements.  Plaintiffs thus fail to show that the duty refunds were short-term investments.[4]

 2.  <u>The Interest Earned Does Not Relate to Plaintiffs' Current Operations</u>

Plaintiffs also argue that their antidumping deposits were not investments, but rather part of their general business costs, thus warranting an offset.  Apex Br. 10.  To support their argument, Plaintiffs note that the court previously allowed Commerce to use long-term interest income to offset costs of production.  *See Hyundai Elecs.*, 28 CIT at 539, 342 F. Supp. 2d at 1161 ("[I]nterest income may be treated as an offset where there is sufficient evidence that the interest income from long-term investment is related to the current operations of a company.").  But Commerce subsequently abandoned this practice.  *See, e.g.*, *Polyethylene Retail Carrier*

---

[4] Plaintiffs also argue the deposit was not undertaken "with the intent of realizing a profit over time," and thus is not an "investment" in the traditional sense.  Apex Reply Br. 3–4, ECF No. 56.  But this argument, in itself, does not demonstrate that Commerce's refusal to treat the interest as short-term was unsupported by substantial evidence or otherwise unlawful.

*Bags from Thailand,* 74 Fed. Reg. 65,751 (Dep't Commerce Dec. 11, 2009) (final admin.

review) and accompanying Issues & Decisions Mem. at cmt. 5, A-549-821 (Dec. 7, 2009)

(repudiating methodology upheld in *Hyundai Electronics*).

  Plaintiffs cite *Gulf States Tube v. United States*, 21 CIT 1013, 981 F. Supp. 630 (1997),

for the same proposition, but their reliance on this case is misplaced.  In *Gulf States*, *id.* at 1038,

981 F. Supp. at 651, the court found plaintiff failed to establish a nexus between its long-term

investments and its current operations expenditures.  *Gulf States* did not declare, however, that

Commerce must provide an offset for long-term investments that fund current operations.  In

fact, as later noted in *Pakfood*, 34 CIT at __, 724 F. Supp. 2d at 1355−56 n.51, *Gulf States*

"explicitly rejected the plaintiff's argument that 'long-term interest income must . . . be taken

into account in calculating a respondent's net interest expense.'" (quoting *Gulf States*, 21 CIT at

1038, 981 F. Supp. at 651).

  The facts and reasoning of *Pakfood* apply here.  In *Pakfood*, the plaintiff's affiliates were

required to maintain funds in lending institutions to have access to loans and credit lines.  *See id.*

at __, 724 F. Supp. 2d at 1354.  The court found Commerce reasonably refused to offset interest

earned on those deposits.  *Id.* at __, 724 F. Supp. 2d at 1357.  Similarly here, Plaintiffs were

required to pay cash deposits to import goods.  In neither case did the companies have

immediate, daily access to the disputed funds.  In both cases, the deposits held by lending

institutions and Customs were long-term costs of doing business.  Commerce was thus not

required to grant an offset for the interest Plaintiffs earned on antidumping duty refunds.

  Plaintiffs also argue that Commerce previously allowed offsets for interest earned on

deposits with government agencies because those deposits were necessary to run a company's

current operations.  *See Glycine from India*, 73 Fed. Reg. 16,640 (Dep't Commerce Mar. 28,

2008) (final determination) and accompanying Issues & Decisions Mem. at cmt. 4, A-533-845

(Mar. 28, 2008).  One agency decision, however, does not a precedent make.  Shortly after the

*Glycine* decision, Commerce stated that it did not yet have a policy concerning whether "certain

interest earned (or owed) on antidumping cash deposits . . . should be taken into account in the

calculation of financial expenses."  *Thailand Shrimp Mem.* at cmt. 5.  Rather, the practice

Commerce has consistently followed is to allow "income expense offsets solely for short-term

income from current assets and working capital accounts."  *Pakfood*, 34 CIT at __, 724 F. Supp.

2d at 1356.  Commerce's decision not to offset interest earned on antidumping duties is thus

supported by substantial evidence and in accordance with law.  Furthermore, because the refund

interest was neither short-term nor related to Plaintiffs' current operations, the court declines to

address whether the interest should be excluded as a direct inevitable consequence of the order.

The court sustains Commerce's decision not to deduct interest earned on refunded

antidumping duties from Plaintiffs' financial expenses.

## II.   Commerce's Refusal to Deduct Antidumping Duties from Plaintiffs' Export Price is Supported by Substantial Evidence and in Accordance with Law

Defendant-Intervenors, in turn, claim Commerce wrongly refused to deduct assessed

antidumping duties from Plaintiffs' export price, yielding erroneously low dumping margins.

They note that 19 U.S.C. § 1677a(c)(2)(A) requires Commerce to subtract from the export price

any amount "included in such price . . . attributable to any additional costs, charges, or expenses,

and United States import duties, which are incident to bringing the subject merchandise" into the

country.  In Defendant-Intervenors' view, antidumping duties are none other than "United States

import duties" or "additional costs" to be deducted under the statute.  The court disagrees with

this interpretation, however, and finds Commerce's approach was grounded in substantial

evidence and in accordance with law.

    1.  <u>The Statute Does Not Unambiguously Require Commerce to Offset Antidumping Duties</u>

       Defendant-Intervenors first argue the law unambiguously required Commerce to deduct

assessed antidumping duties from Plaintiffs' export price.  The relevant statutory language,

however, is open to interpretation.  *See id.*  As the Federal Circuit observed, the statute does not

define the terms "United States import duties" or "costs, charges or expenses."  *Wheatland Tube*

*Co. v. United States*, 495 F.3d 1355, 1359–60 (Fed. Cir. 2007) (discussing U.S. import duties);

*see also Hoogovens Staal BV v. United States*, 22 CIT 139, 146, 4 F. Supp. 2d 1213, 1220 (1998)

(discussing both U.S. import duties and costs, charges, and expenses).  Because the statute does

not define these terms, "the question for the court is whether the agency's [action] is based on a

permissible construction of the statute."  *Chevron*, 467 U.S. at 843.

       The court finds Commerce's construction was indeed permissible.  As explained in the

I&D Memo, Commerce deducted neither antidumping duty deposits nor assessed antidumping

duties from Plaintiffs' export price.  *See I&D Mem.* at cmt. 3.  This approach, which was adeptly

illustrated and upheld in *Ad Hoc Shrimp Trade Action Committee v. United States*, 37 CIT __,

__, 925 F. Supp. 2d 1367, 1372−77 (2013), acted to restore to normal value the price that

unaffiliated U.S. buyers paid for Plaintiffs' goods.  Contrary to Defendant-Intervenors' claims,

Commerce's method works regardless of whether the unaffiliated U.S. buyer or the exporter

acting as importer of record pays antidumping duties.  *Id.* at __, 925 F. Supp. 2d at 1375 n.21

(upholding Commerce's method even when exporter acts as importer of record).  *But see* Ad Hoc

Br. 14 (alleging Commerce must deduct antidumping duties from export price when exporter

sells under delivered-duty-paid contract).

By contrast, if Commerce deducted assessed antidumping duties from the export price,

then Plaintiffs would pay more in duties than the antidumping statute intends. *See Ad Hoc*

*Shrimp*, 37 CIT at __, 925 F. Supp. 2d at 1373−75.[5] Under Defendant-Intervenors' proposed

method, Commerce would have to (1) calculate antidumping duty margins for both Plaintiffs; (2)

assess duties pursuant to those margins that, in the normal course, would be paid by Plaintiffs

acting as importers; (3) increase the dumping margin for each Plaintiff by deducting those duties

from Plaintiffs' export prices (creating a revised export price); and (4) assess new, higher duties

to account for the deduction. And logically, if duties were considered a "cost, charge, or

expense," then those new, higher duties would also be subject to the same deduction process.

---

[5] Technically, *Ad Hoc Shrimp*, 37 CIT at __, 925 F. Supp. 2d at 1374, found that deducting antidumping duty deposits (not assessed duties) would produce inflated margins. But deducting assessed duties would also result in excessive margins. To illustrate, suppose a good has a normal value ("NV") (after all relevant adjustments) of $150 before Commerce issues an antidumping duty order. During the investigation, Commerce finds the export price ("EP") (after all relevant adjustments) is $100. Commerce would consequently set a 50% deposit rate ((NV – EP)/EP = (150 – 100)/100 = 50/100 = 50%). *See* 19 U.S.C. § 1677(35)(B) (outlining formula for weighted average dumping margins).

Now suppose the exporter (acting as importer of record) makes just one entry of merchandise following the investigation. The exporter sells its good to an unaffiliated U.S. buyer for $120 plus a $60 antidumping duty deposit (120*50% = 60), for a total U.S. price of $180. On these facts, if Commerce chose not to deduct antidumping deposits and duties from EP during the administrative review, then Commerce would find no dumping occurred. EP ($180) would exceed NV (assuming a consistent $150 NV) by $30, negating any need for final assessed duties. Customs would refund the $60 deposit to the exporter following an administrative review, and the antidumping statute would have achieved its purpose, i.e., to increase EP to NV or above. *See id.* § 1673 (mandating antidumping duties "in an amount equal to the amount by which the normal value exceeds the export price").

But suppose Commerce instead deducted "assessed antidumping duties" from EP. *See* Ad Hoc Br. 14. Using Defendant-Intervenors' method, Commerce would subtract the U.S. sales price (less antidumping duty deposits) from NV, yielding a 25% dumping rate ((150 – 120)/120 = 30/120 = 25%). Commerce would then reassess the margin, this time subtracting $30 in "assessed duties" (120*25%) from EP, yielding a 50% dumping rate ((150 – (120 – 30))/120 = (150 – 90)/120 = 60/120 = 50%). Under the 50% dumping rate, the exporter (acting as importer of record) would be liable for $60 in duties (120*50%), and Customs would return none of the exporter's $60 deposit. In sum, the government would receive a $60 windfall, even though the exporter raised its U.S. price to $180, a price well above the good's $150 NV. This is not what the antidumping regime was designed to do. *See* 19 U.S.C. § 1673.

*See* 19 U.S.C. § 1677a(c)(2)(A).  This would result in circular calculations and impermissible double-counting of the dumping margins.  It was reasonable for Commerce to interpret the statute to avoid this absurd result.

Defendant-Intervenors offer an illustration to support its suggested approach, but it is unconvincing.  *See* Ad Hoc Br. 12−14.  The illustration assumes the following baseline facts: "[A]n exporter sells a product to an unrelated customer at $100 on a C&F [cost-and-freight] basis in both the U.S. and [a third-country] comparison market." *Id.* at 12.[6]  "[F]reight and other similar costs" are $8 in the U.S. market and $5 in the comparison market. *Id.*  Under these conditions, the normal value of the exporter's product would be $95 and the export price would be $92, yielding a $3 antidumping duty.  Consequently, the unaffiliated U.S. customer would pay a total of $103 for the exporter's product. *Id.* at 12−13.

In its first variation on these facts, Defendant-Intervenors suppose freight costs to U.S. markets increase to $13, but the exporter continues to charge the U.S. customer $100 for its product. *Id.* at 13.  The export price thus decreases to $87, normal value remains at $95, and the dumping margin increases to $8.  Under the C&F contract, the U.S. customer would be liable for antidumping duties and pay a total of $108 for the exporter's product ($100 U.S. price + $8

---

[6] C&F, also known as CFR, is an Incoterm delineating certain terms in an international business transaction.  An Incoterm is "[a] standardized shipping term, defined by the International Chamber of Commerce, that apportions the costs and liabilities of international shipping between buyers and sellers." *Black's Law Dictionary* 782 (8th ed. 2004).  According to the Incoterms, CFR "means that the seller delivers the goods on board the vessel or procures the goods already so delivered.  The risk of loss of or damage to the goods passes when the goods are on board the vessel.  The seller must contract for and pay the costs and freight necessary to bring the goods to the named port of destination."  Int'l Chamber of Commerce, *Incoterms 2010*, at 95 (2010) ("*Incoterms 2010*").

antidumping duties).  The exporter would earn $87 on the transaction ($100 U.S. price – $13 freight).  *See id.*

In the second variation on the baseline facts, Defendant-Intervenors assume freight costs remain the same, but the terms of the transaction change from C&F to delivered-duty-paid ("DDP").  *Id.*[7]  Under the DDP contract, the exporter would be responsible for paying $1 in brokerage and customs fees upon importation.  Normal value would thus remain $95, the export price would drop to $91 to reflect the $1 import fee, and antidumping duties would total $4.  Ad Hoc argues that the exporter would pay these antidumping duties under the DDP contract, and consequently, that the U.S. customer would pay $100 for the exporter's product.  As in the first variation, the exporter would earn only $87 on the transaction ($100 U.S. price – $8 freight – $1 customs fees – $4 antidumping duties).  *See id.*

Defendant-Intervenors observe that antidumping duties are $8 in the first hypothetical and $4 in the second, even though the exporter earns $87 in both scenarios.  *Id.* at 13−14.  To cure this apparent error, Defendant-Intervenors would require Commerce to deduct the $4 antidumping duty in the second hypothetical from the export price ($91 export price – $4 antidumping duty = $87).  This would yield an $8 antidumping duty, on par with the $8 duty in the first hypothetical.  *See id.*

Though creative, these illustrations do not prove that Commerce must deduct antidumping duties from Plaintiffs' export price.  *See* 19 U.S.C. § 1677a(c)(2)(A).  First, the

---

[7] DDP "means that the seller delivers the goods when the goods are placed at the disposal of the buyer, cleared for import on the arriving means of transport ready for unloading at the named place of destination.  The seller bears all the costs and risks involved in bringing the goods to the place of destination and has an obligation to clear the goods not only for export but also for import, to pay any duty for both export and import and to carry out all customs formalities."  *Incoterms 2010,* at 69.

focus of antidumping law is not the exporter's profits, as suggested by Ad Hoc's hypotheticals.

Rather, antidumping duties act to equalize the price of U.S.-imported goods and the price of like

goods in the exporter's home market.  It is thus irrelevant that the exporter in the second

hypothetical earned the same profits as the first.  *See* Gov't Br. 37.  Second, and in a similar vein,

Ad Hoc's illustrations assume the exporter would not raise its U.S. price to offset duties the

exporter paid under the DDP contract.  But whether the exporter passes the cost of antidumping

duties to the buyer is a matter of private contract.  *Id.*  Finally, unlike the parties in the first

variation of Ad Hoc's illustration, Plaintiffs' unaffiliated U.S. customers did not pay

antidumping duties upon importation.  Instead, Plaintiffs acted as their own importers of record

and paid the duties themselves, rendering at least part of Ad Hoc's illustration inapplicable.

Commerce also successfully opposes Defendant-Intervenors' claim that the disputed

duties cannot be distinguished from other import fees paid to Customs or customs brokers.  Ad

Hoc Br. 11.  In calculating dumping margins, Commerce compares the normal value of the

merchandise to the export price (or constructed export price) of a company's U.S. sales.  *See* 19

U.S.C. § 1677(35)(A).  As a first step, Commerce must calculate export and normal prices; in the

second step, it finds the difference between the two.  Unlike freight, broker fees, and customs

duties, which are expenses deducted at the first step, antidumping duties are not determined until

the second step.  Accordingly, they cannot be "costs" inherent in the underlying business

transaction, and are thus not subject to deduction from the export price.  *See id.* § 1677a(c)(2);

*see also* Gov't Br. 38.

2. Commerce's Objections Are Supported by a Legal and Evidentiary Basis

Defendant-Intervenors next argue that Commerce's refusal to deduct antidumping duties lacks an evidentiary and legal basis. The court disagrees. As explained in the I&D Memo, Commerce has a longstanding practice "not to deduct antidumping duties as costs, expenses or import duties because antidumping duties are neither selling expenses nor normal customs duties." *I&D Mem.* at cmt. 3; *see also Certain Cold-Rolled Carbon Steel Flat Products from Korea*, 63 Fed. Reg. 781, 786–87 (Dep't Commerce Jan. 7, 1998) (final admin. review). Such practices have been sustained not only by this court but also by the Federal Circuit. *See Wheatland*, 495 F.3d at 1361; *Hoogovens*, 22 CIT at 146, 4 F. Supp. 2d at 1220; *Ad Hoc Shrimp*, 37 CIT at __, 925 F. Supp. 2d at 1372−77; *AK Steel Corp. v. United States*, 21 CIT 1265, 1280 n.12, 988 F. Supp. 594, 608 n.12 (1997). Furthermore, as previously discussed, deducting antidumping duties could result in double-counting and circular calculations. There is thus a sound basis for Commerce's refusal to deduct antidumping duties from Plaintiffs' export price.

Even so, Defendant-Intervenors argue that Commerce may subtract antidumping duties from export prices under 19 C.F.R. § 351.402(f)(l)(i), which directs Commerce to deduct any antidumping duties the exporter pays on behalf of, or reimburses to, the importer. This provision is inapplicable here, however, because Plaintiffs neither reimbursed an importer nor paid duties on an importer's behalf. Rather, they acted as their own importers of record and could not reimburse themselves. *See Agro Dutch Indus. Ltd. v. United States,* 508 F.3d 1024, 1031 (Fed. Cir. 2007) (holding single importer could not be "affiliated" with itself under duty absorption statute); *see also Brass Sheet and Strip from Germany*, 75 Fed. Reg. 66,347 (Dep't Commerce Oct. 28, 2010) and accompanying Issues & Decisions Mem. at cmt. 9, A-428-602 (Oct. 28,

2010) (holding two separate entities must exist to invoke reimbursement regulation).  Just

because Commerce may deduct reimbursed antidumping duties under 19 C.F.R.

§ 351.402(f)(l)(i) does not mean it must also deduct those duties where no reimbursement is

made.  *See Ad Hoc Shrimp*, 37 CIT at __, 925 F. Supp. 2d at 1375−77 (explaining purpose and

effect of reimbursement regulation).

        Given this evidence, the court need not address Ad Hoc's other arguments in detail.

They claim, for example, that Commerce unreasonably interpreted the export price law using the

legislative history of the "duty absorption provision."  Ad Hoc Br. 16–17.  But this provision is

relevant here.  In the Statement of Administrative Action relating to the duty absorption

provision, Congress stated the provision was "not intended to provide for the treatment of

antidumping duties as a cost."  Gov't Br. 36 (quoting Uruguay Round Agreements Act,

Statement of Administrative Action, H.R. Rep. No. 103-316, vol. 1, at 885 (1994), *reprinted in*

1994 U.S.C.C.A.N. 4040, 4210) (internal quotation marks omitted).  Finally, even if the duty

absorption provision is irrelevant to calculating dumping margins, Commerce's other interpretive

arguments suffice to receive *Chevron* deference.

        The court therefore sustains Commerce's refusal to deduct antidumping duties from

Plaintiffs' export prices.

**III.   Commerce's Practice of "Zeroing" in Administrative Reviews Is in Accordance
         with Law**

        Finally, Plaintiffs challenge whether Commerce acted lawfully in using "zeroing" to

determine Plaintiffs' "weighted average dumping margin."  *See* 19 U.S.C. § 1677(35)(B).  When

Commerce "zeroes" in a constructed value calculation, it disregards all U.S. sales for which the

constructed export price exceeds the normal value, setting these sales at zero in determining the

numerator of the dumping margin calculation.  Thus, Commerce effectively calculates a

dumping margin only for dumped sales, and does not consider any non-dumped sales in its

estimate.  While this practice has long been upheld, some have questioned whether Commerce

could reasonably "zero" dumping margins in administrative reviews but not investigations.  *See*

*Dongbu Steel Co. v. United States*, 635 F.3d 1363, 1372−73 (Fed. Cir. 2011); *JTEKT Corp. v.*

*United States*, 642 F.3d 1378, 1379 (Fed. Cir. 2011); *Sucocitrico Cutrale Ltda. v. United States*,

Slip Op. 12-71, 2012 WL 2317764, at *3−4 (CIT June 1, 2012).

Despite recent controversy on the matter, it is now settled law—and binding precedent on

this Court—that it is reasonable for Commerce to interpret the statute to allow zeroing in

administrative reviews but not in investigations.  *See generally Union Steel v. United States*, 713

F.3d 1101 (Fed. Cir. 2013) (holding that Commerce's explanation of its zeroing practice is a

reasonable interpretation of statute).  The court therefore sustains Commerce's decision to use

zeroing during the fifth administrative review.

## <u>CONCLUSION AND ORDER</u>

Plaintiffs' Motion for Judgment on the Agency Record is denied.  The court sustains

Commerce's decisions regarding offsets for interest earned on antidumping duty refunds and

zeroing.  Defendant-Intervenors' Motion for Judgment on the Agency Record is also denied.  The

court sustains Commerce's refusal to deduct antidumping duties from Plaintiffs' export price.

Judgment will enter accordingly.

<u>/s/ Richard W. Goldberg</u>
Richard W. Goldberg
Senior Judge

Dated: December 31, 2013
New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| APEX EXPORTS and FALCON MARINE EXPORTS LIMITED,<br><br>　　　　　　　　　　Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>　　　　　　　　　　Defendant,<br><br> and<br><br>AD HOC SHRIMP TRADE ACTION COMMITTEE and AMERICAN SHRIMP PROCESSORS ASSOCIATION,<br><br>　　　　　　　　Defendant-Intervenors. | Before: Richard W. Goldberg, Senior Judge<br>Consol. Court No. 11-00291 |

## JUDGMENT

This case having been submitted for decision, and the court, after due deliberation, having rendered an opinion; now in conformity with that decision, it is hereby

**ORDERED** that the final determination of the United States Department of Commerce, published as *Certain Warmwater Shrimp from India*, 76 Fed. Reg. 41,203 (Dep't of Commerce July 13, 2011) (final admin. review), be, and hereby is, SUSTAINED; it is further

**ORDERED** that Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record be, and hereby is, DENIED; it is further

**ORDERED** that Defendant-Intervenors' Rule 56.2 Motion for Judgment on the Agency Record be, and hereby is, DENIED.

/s/ Richard W. Goldberg
Richard W. Goldberg
Senior Judge

Dated: December 31, 2013
New York, New York